1

2

3

4

5

6

7

8        UNITED STATES DISTRICT COURT

9        EASTERN DISTRICT OF CALIFORNIA

10

11    JUAN PEREZ, Jr.,                              No. 1:18-cv-00190-LJO-SKO (HC)

12              Petitioner,

13        v.                                        **FINDINGS AND RECOMMENDATION**
                                                    **THAT THE COURT DENY PETITION**
14    WILLIAM MUNIZ, Warden, Salinas                **FOR WRIT OF HABEAS CORPUS**
      Valley State Prison,
15
                Respondent.                         **(Doc. 1)**
16

17

18

19            Petitioner, Juan Perez, Jr., is a state prisoner proceeding pro se with a petition for writ of

20    habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner presents five grounds for habeas relief: (1)

21    insufficient evidence; (2) a due process violation based on the trial court consolidating two cases;

22    (3) prosecutorial misconduct; (4) jury instruction error; and (5) cumulative error.  The Court

23    referred the matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302

24    and 304.  Having reviewed the record and applicable law, the undersigned recommends that the

25    Court deny habeas relief.

26

27

28

                                                    1

# I.    <u>Procedural and Factual Background[1]</u>

In July 2011, Ignacio Gonzalez ("Gonzalez") was a 20-year-old former Northerners gang member living in Earlimart, California.  Gonzalez had dropped out of the gang in July 2008, after he assisted police in a murder investigation.

After leaving the gang, Gonzalez got into fights with gang members.  In January 2011, Gonzalez was attacked by two men in the front yard of his family's home.  One attacker had a knife, the other was carrying a bat.  Gonzalez had to jump through a window into his home to escape the attack.  Gonzalez told police that one of the attackers was "the Lopez young brother," who Gonzalez said attached him because Gonzalez had "ratted" by giving the authorities information about a murder in July 2008.  A member of Gonzalez's former gang, Julio Macias ("Macias"), referred to Gonzalez as "Dead man walking," because Gonzalez had snitched on one of the gang members.  Macias also said, "they were going to smoke [Gonzalez's] ass."

On January 14, 2011, Gonzalez was barbequing in his front yard with his family and his friend Victor Almaguer ("Almaguer").  Almaguer worked with Gonzalez but had never been a member of a gang.  Elena Becerra ("Becerra"), Gonzalez's mother, left the home at 6:00 p.m. and returned at approximately 8:00 p.m.  Gonzalez and Almaguer were still in the front yard when Becerra returned.

Shortly after Becerra returned, a group of young people dressed in black hooded sweatshirts who had been seen huddling together nearby approached Gonzalez and Almaguer, fired multiple shots at both men, and killed them.  Almaguer had a gunshot wound to the leg and a fatal wound to his head.  Gonzalez had gunshot wounds to his head and chest, either of which would have been fatal.

---

[1] The factual background, taken from the opinion of the California Court of Appeal, Fifth Appellate District, *People v. Perez*, F068416, 2016 WL 4014071(Cal. Ct. App. July 27, 2016), is presumed to be correct.  28 U.S.C. § 2254(e)(1).

Becerra, Gonzalez's mother, heard multiple gunshots and ran out of the house.  She saw men running toward a van, including Petitioner.  Petitioner looked straight at Becerra, who recognized him because he used to pick Gonzalez up to play basketball.  Petitioner walked around the van, got into another car, and both vehicles drove away in different directions.

Freddy Hernandez, Jr., was using a payphone at a market across the street from the Gonzalez's home and was hit in the left knee and right leg by stray bullets.  Marina Gutierrez was waiting at a stop sign when a bullet shattered her windshield.  Gutierrez told investigators she heard a "rash" of gunshots.

Investigators found 31 nine-millimeter shell casings at the scene.  The casings were ejected from two different semiautomatic guns.

At 6:30 p.m. on the day of the murders, a two-door, yellow or golden Chevrolet Cobalt was stolen from a residence in Delano, California, about eight miles from Earlimart.  The Cobalt was later found at 10:36 p.m. by firefighters.  The car was engulfed in flames and completely burned.

Approximately one hour after the murders, Macias, a member of the Northerners gang, spoke to friend on the phone.  The friend asked Macias whether he had committed the murders.  Macias responded by laughing, but did not affirmatively admit to committing the murders.  When the friend asked why Almaguer was killed, Macias replied, "It was that bitch deserved what he got."  Macias later explained that he warned Almaguer on the day of the murders, "I wouldn't be here today if I was you."  Almaguer responded by stating that Gonzalez was his friend.  Macias stated, "It was funny I even warned him and he still – still stayed."

On October 12, 2011, Tulare County Sheriff's Detectives learned a Northerner gang dropout, Uriel Uribe ("Uribe"), was in custody and questioned him about the murders.  Uribe spoke to Macias on the night of the murders.  Macias stated he and other gang members drove by Gonzalez's house earlier in the day and saw Gonzalez and Almaguer in the front yard.  Gonzalez

"flipped off" Macias and his party as they drove by. Macias called Antonio Valdez ("Valdez") to let him know that Gonzalez was in his front yard. Macias and his party continued to the home of a different gang member, Angel Gutierrez ("Gutierrez").

When Macias arrived at Gutierrez's house, Gutierrez told Macias that Petitioner, Valdez, and a third person had picked up two firearms and left. Approximately 10 minutes later, the group at Gutierrez's house heard gunshots and drove to the scene of the crime, where they stayed for five minutes before leaving.

As Uribe was driving around Earlimart with Macias on the night of the murder, Macias received a call from Valdez. Valdez was screaming that he had just shot Gonzalez in the face and Petitioner had shot Almaguer.

At an apartment later in the evening, Uribe heard Petitioner say Valdez shot Gonzalez in the face. Petitioner detailed that he and Valdez approached Gonzalez's home from the rear, jumped over the fence, shot the victims, and left the scene in a stolen car. Petitioner stated they burned the stolen vehicle, as well as the clothes they were wearing. Petitioner described the gun he used as "very strong," and said, "the [dropouts] thought they were cool chilling outside their house."

On November 16, 2011, Gutierrez was arrested on gun charges. In exchange for a plea deal, Gutierrez gave statements to the police about the double murders and testified at Petitioner's trial. Gutierrez was a Northerner gang member since the age of 13 and had known Petitioner since high school.

Gutierrez's job for the gang was to hold guns for fellow gang members. He was good friends with Gonzalez, the murder victim, until Gonzalez dropped out of the gang, after which, the two remained friends "on the down low." The gang did not like the friendship between Gutierrez and Gonzalez because members were not supposed to associate with dropouts. Gutierrez was told by fellow gang members that Gonzalez was "not good for the hood."

4

A week before the murders, a gang member dropped off a nine-millimeter handgun, referred to as "Rusty Old 9," at Gutierrez's house. Gutierrez placed the gun in the truck bed of his uncle's truck. Petitioner picked up the gun from Gutierrez's house either on the day of the murders or two to three days before. Gutierrez saw other gang members in a four-door beige car with Petitioner when he picked up the gun, but could not identify them.

Gutierrez testified that at 6:00 or 7:00 p.m. on the day of the murders, Macias and two others went to Gutierrez's house. The group smoked marijuana and talked about gang dropouts, specifically mentioning Gonzalez, stating they might beat up Gonzalez if they saw him. The visitors stayed at Gutierrez's house for several hours, until they heard gunshots. The men left Gutierrez's home shortly thereafter.

In May 2011, Pablo Garcia ("Garcia") lived in Earlimart, California, next door to Ernie Medrano ("Medrano"). Garcia was not part of a gang; however, gang members who wore red clothing[2] frequently went to Medrano's house.

At 8:30 p.m. on May 8, 2011, Garcia left his house to pick up his sister in his pickup truck. As he left his house, Jacinto Magallenas ("Magallenas") stopped him in front of Medrano's house and asked for a ride for himself and two of his friends, one of whom was Petitioner. Magallenas sat next to Garcia, while Petitioner and the other male sat in the bed of the pickup truck. Magallenas directed Garcia as he drove.

On Earlimart Avenue, Magallenas told Garcia to stop the car. Magallenas exited the car, walked around to the driver's side, opened the door, and shot Garcia in the neck. Petitioner jumped out of the pickup bed at the same time Magallenas shot Garcia. Garcia was pulled out of the truck and Magallenas, Petitioner, and the third man drove away.

---

[2] The color red is the color associated with the Northerners gang.

Lupe Lopez, Jr., ("Lopez") saw the shooting from approximately 100 yards away. He told sheriff's deputies he saw a man in a white shirt pull Garcia from the truck, lay him on the ground in the middle of the street, get in the driver's seat, and drive away. Lopez gave sheriff's deputies several different versions of the events. At trial, Lopez testified he only saw the victim on the road after the shooting, and the victim was the man in the white shirt. Lopez's statements to the sheriff's deputies were admitted as prior inconsistent statements.

A blue denim hat was found next to Garcia's body.[3] The shooting left him a wheelchair-bound quadriplegic. Garcia's truck was found the next day on a dirt road in a vineyard not far from the scene of the shooting. The keys were in the ignition, the passenger door was open, and there was blood on the driver's seat.

On November 21, 2011, a search warrant was served on Petitioner's home. While attempting to enter the house, investigators saw Petitioner try to jump over a fence to flee. After being seen, Petitioner went back into the house.

At trial, Petitioner's brother, mother, and another family member testified that Petitioner was at a barbeque at his mother's house on May 8, 2011, and did not leave until after the shooting. A nine-year old boy also testified that he saw the shooting, and Petitioner was not present at the shooting.

A few weeks after the shooting, Garcia identified Magallenas and Petitioner from photographic lineups.

Tulare County Sheriff's Sergeant Crystal Derington ("Derington") testified as a gang expert at Petitioner's trial. Derington testified that the worst thing a gang member can do is to be a snitch, which is viewed as being a traitor and a dropout. Gang members cannot associate with dropouts, especially when they are snitches.

---

[3] The color blue is associated with the Southerners gang, which is a rival of the Northerners.

The Northerners gang is an umbrella group that includes the prison gang, Nuestra Familia, and the Infamous Youngsters ("IY"). The primary activities of the Northerners gang include homicides, shootings, robberies, burglaries, drive-by shootings, assaults, drug dealing, prostitution, extortion, carjacking, and witness intimidation. Gang members often use stolen vehicles to commit crimes.

In 2008, Petitioner and another IY gang member were involved in a fight with a school resources officer at Petitioner's high school. In 2009, Petitioner was contacted by law enforcement three times while he was with other IY gang members. The first time, Petitioner was wearing a red and white T-shirt and denied any gang affiliation. The third time, he admitted gang membership.

In 2010, Petitioner encountered law enforcement four times. The first time, he was wearing a red baseball cap with the letter "N" on it, but denied it was gang attire. The second time, he was found in possession of gang indicia that included membership with the IY gang, and spoke about looking for dropouts. The third time, he was wearing an IY t-shirt. The fourth time, he was in the company of a fellow gang member.

Tulare County Sheriff's Sergeant Derington had 15 contacts with Petitioner, and law enforcement in general had at least 60 contacts with him. Based on contacts, photographs, and other evidence, Derington testified that Petitioner was a member of the IY clique of the Northerners gang. Derington also found evidence that Gutierrez, Macias, and Valdez were members of the Northerners gang, and they promoted, furthered, and assisted the gang.

Regarding Garcia's shooting, Derington testified the Southerners gang associates with the color blue and is a rival to the Northerners. Gang members in Earlimart are predominantly from the Northerners gang and are expected to kill as many Southerner gang members as possible. A person who lived near a Northerner gang member and wore a blue hat could be perceived by Northerners as a rival gang member. Garcia could be perceived as a rival gang member because

he was a close neighbor to Medrano, a Northerner gang member, but did not associate with Medrano.

Evidence of another crime Petitioner allegedly committed, but was not charged with, was also presented at trial. Efrain Sarabia ("Sarabia") was a high-ranking Northerner gang member who spent time with Petitioner, before he dropped out of the gang. Sarabia was also good friends with Gonzalez. After he dropped out of the gang, Sarabia got into fights with members of the Northerners.

On March 18, 2010, at 9:30 p.m., Sarabia, his brother-in-law, and a child were sitting in a car in front of Sarabia's house. Petitioner, Valdez, and two other gang members drove by the car several times in a large, white SUV. During one of the drive-bys, Petitioner and Valdez fired shots at Sarabia. One of the passengers was shot in the knee and Sarabia was shot in the neck. Sarabia described the gun used by Petitioner as similar to a nine-millimeter Uzi.

The SUV used by Petitioner and the other gang members was located the following morning at 6:33 a.m. on a rural dirt road near Earlimart. The car had been stolen around 8:00 p.m. on the night of the shooting.

Petitioner was charged in two separate cases, one for double murder of Gonzalez and Almaguer, and the other for attempted murder and carjacking of Garcia. On the prosecution's motion, the court consolidated the cases. The information alleged crimes occurring on January 14, 2011 (counts 1 through 5), and May 8, 2011 (counts 6 and 7). In count 1, Petitioner was alleged to have entered into a conspiracy to commit murder (Cal. Penal Code §§182(a)(1), 187(a)(1)). Five overt acts were alleged in count 1: (1) [Petitioner] and his coconspirators traveled to Angel Gutierrez's residence in Earlimart; (2) [Petitioner] and a coconspirator obtained guns from Angel Gutierrez; (3) [Petitioner] possessed a gun; (4) [Petitioner] and his coconspirators traveled to State and Washington Streets in Earlimart; and (5) [Petitioner] and a coconspirator fired guns.

Further, Petitioner was alleged to have committed the offense of criminal street gang conspiracy to assist felonious criminal conduct by members of the gang (Cal. Penal Code § 182.5, count 2); murder of Victor Almaguer (Cal. Penal Code § 187(a), count 3); and murder of Ignacio Gonzalez (count 4). Counts 3 and 4 further alleged special circumstance allegations for being an active participant in a criminal street gang, murdering to further the activities of the criminal street gang (Cal. Penal Code §190.2(a)(22)), and multiple murders (Cal. Penal Code § 190(a)(3)).

Counts 3 and 4 alleged the murders were committed to promote a criminal street gang (Cal. Penal Code §§ 186(b)(1)(C), 186.22(b)(4)), making Petitioner eligible for a life sentence for acting on behalf of a criminal street gang (Cal. Penal Code § 186.22(b)(5)). Counts 3 and 4 alleged that Petitioner personally used a gun causing great bodily injury and death within the meaning of California Penal Code § 12022.53(d) and (e)(1).

Petitioner was also alleged to have committed assault with a firearm on Freddy Hernandez on the date of the murders (Cal. Penal Code § 245(a)(2), count 5); attempted murder of Pablo Garcia (Cal. Penal Code §§ 664, 187(a)(2), count 6); and carjacking (Cal. Penal Code § 215(a), count 7). Counts 6 and 7 alleged Petitioner was armed with a handgun within the meaning of California Penal Code § 12022(a)(1).

A jury convicted Petitioner of all counts and found all special allegations true. The trial court sentenced Petitioner on count 7 to the upper term of nine years, plus a consecutive term of one year for using a gun. Petitioner was sentenced to consecutive terms of one year on count 5, life with the possibility of parole on count 6, and one year on count 6 for using a gun. On counts 3 and 4, Petitioner was sentenced to consecutive terms of life without the possibility of parole plus an additional consecutive term of 25 years to life for personally using a firearm leading to great bodily injury or death. On counts 1 and 2, Petitioner was sentenced to terms of 25 years to life, but the sentence was stayed.

9

The California Court of Appeal affirmed the judgment on July 27, 2016, and the California Supreme Court denied review on November 9, 2016.

Petitioner filed his petition for writ of habeas corpus with this Court on February 6, 2018. Respondent filed an answer on April 6, 2018, and Petitioner filed a traverse on August 2, 2018.

## II.    Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).  Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings.  *Id.*  Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. In doing so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

**III.     The State Court Did Not Err in Denying Petitioner's Insufficient Evidence Claims**

In his first ground for relief, Petitioner alleges there was insufficient evidence adduced at trial to support the jury's verdict on the carjacking and attempted murder counts. (Doc. 1 at 23-26.) Petitioner claims there was evidence at trial that Petitioner was not present at the carjacking

and shooting of Garcia; therefore, the evidence does not support the conviction.  *Id*. at 24. According to Petitioner, even if the evidence shows that he was at the scene of the crime, the evidence is insufficient to prove he aided or abetted or was a conspirator in the commission of the crime.  *Id*.  Respondent counters that Petitioner failed to show the California Court of Appeal unreasonably applied clearly established federal law in rejecting Petitioner's claim.  (Doc. 8 at 20.)

## A.  Standard of Review for Insufficient Evidence Claims

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998).  It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict.  *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

## B.  State Court of Appeal Opinion

The California Court of Appeal denied Petitioner's claim that there was insufficient evidence to convict him of the attempted murder and carjacking of Garcia:

> When a defendant challenges the sufficiency of the evidence, appellate courts must review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence – evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  This standard of appellate review is the same in cases in which the People primarily rely on circumstantial evidence.  Although a jury must acquit if it finds the evidence susceptible of a reasonable interpretation favoring innocence, it is the jury, not the reviewing court, that weighs the evidence, resolves conflicting inferences, and determines whether the People have met the burden of establishing guilt beyond a reasonable doubt.  If the trier of fact's findings are reasonably justified under the circumstances, the opinion of the reviewing court that the circumstances may also be reconciled with a contrary finding does not warrant reversal of the judgment.  (*People v. Casares* (2016) 62 Cal.4th 808, 823-

12

924.)  After reviewing the evidence in the light most favorable to the prosecution, we determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212-1213.)

Unless the testimony of a single witness is physically impossible or inherently improbable, it is sufficient for a conviction.  (Evid. Code, § 441; *People v. Young* (2005)35 Cal.4th 1149, 1181.)  An appellate court must accept logical inferences the jury might have to draw from circumstantial evidence.  (*People v. Maury* (2003) 30 Cal.4th 342, 396.)  Before setting aside the judgment of the trial court for insufficiency of the evidence, it must clearly appear there was no hypothesis whatever upon which there was substantial evidence to support the verdict.  (*People v. Conners* (2008) 168 Cal.App.4th 443, 453; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

The jury was given instructions on aiding and abetting a crime (CALCRIM No. 401), conspiracy to commit murder (CALCRIM No. 563), evidence of uncharged conspiracy (CALCRIM No. 416), and liability for the coconspirator's acts (CALCRIM No. 417).  The prosecutor argued the jury could reasonably infer Magallenas and [Petitioner] worked together as part of a coordinated plan.  The prosecutor further argued Magallenas and [Petitioner] acted together as part of a coordinated plan.  The prosecutor further argued Magallenas and [Petitioner] acted together as a well-oiled machine to commit crimes constituting two of their gang's primary activities, murder and carjacking.  The prosecutor argued the two gang members were doing their job for the gang.

[Petitioner] was not merely present with Magallenas during the Pablo Garcia shooting and carjacking.  Magallenas flagged down Garcia and asked for a ride for himself and his friends, including [Petitioner], who sat in the bed of the pickup truck.  According to Garcia, Magallenas gave directions as to where to go and told Garcia when to stop.  As Magallenas exited the truck, Garcia remembered [Petitioner] jumping out of the bed of the truck.  Magallenas initially walked away from the truck but then back toward it before opening the driver's side door and shooting Garcia.  [Petitioner] was seen pulling Garcia out of the truck, placing him on the road, and driving away from the truck.  This conduct appeared to be coordinated.

The gang expert, Sergeant Derington, testified Sureños are associated with the color blue and are rivals to Norteños.  Gang members in Earlimart are predominantly from the Norteño gang and are expected to kill as many Sureño gang members as possible.  A person who lived near a Northerner gang member and who wore a blue hat could be perceived by Northerners as a rival gang member.  Also, Pablo Garcia could be perceived as a rival gang member because he lived close to Medrano, a member of the Norteño gang, but did not associate with Medrano.

Based on the hypothetical mirroring of the People's evidence, Derington opined the attempted murder and carjacking of Pablo Garcia was committed for the purposes of the Northerner gang.  She specifically believed the blue hat Garcia was wearing created the perception he was a rival gang member, and "one of the cardinal rules within the gang is . . . to take out any and all rivals sighted at the time."  Derington also testified homicide and carjacking were among the crimes committed for the benefit of the gang.

13

Because there were two males in the bed of the pickup truck. [Petitioner] argues there was no evidence demonstrating he was the person who removed Pablo Garcia out of the cab and drove away with his pickup truck. The People explain why this argument is unpersuasive. Garcia testified [Petitioner] jumped out of the pickup truck's bed onto his side, the driver's side, of the cab. Also, Lupe Lopez, Jr., told Sergeant Zaragoza the person sitting in the back of the truck jumped out, approached the driver's side door, and pulled the driver out before driving away. This evidence was sufficient to support the jury's finding [Petitioner] was the person who pulled Garcia out of the pickup truck, after Magallenas shot him, and drove away from Garcia's truck.

We acknowledge there is other contradictory evidence in the record. Lupe Lopez, Jr., told another deputy the man who had pulled Pablo Garcia out of the truck and drove away had exited from the passenger side of the truck cab and was wearing a white shirt. Another witness described the male who pulled Garcia out of the truck as wearing a black shirt. As noted above, our task on appeal is to view the evidence in the light most favorable to the jury's verdict. Garcia's testimony and identification of [Petitioner] is such evidence.

The evidence adduced at trial, including the reasonable inferences to be drawn from that evidence, supported the prosecution's theory, Magallenas and [Petitioner] acted in a well-coordinated conspiracy to attempt to kill Pablo Garcia and carjack his vehicle. The jury could find [Petitioner] criminally liable for attempted murder and carjacking based on an uncharged conspiracy, aiding and abetting, or both theories. There is circumstantial evidence the motive for the attempted murder and carjacking was to retaliate against a perceived rival gang member and to intimidate the community to enhance the prestige of [Petitioner] and his Northerner gang. Viewing the evidence as a whole, we conclude there is substantial evidence in the record to sustain [Petitioner]'s convictions for attempted murder and carjacking.

*People v. Perez*, F068416, 2016 WL 4014071, at *9-11 (Cal. Ct. App. July 27, 2016).

## C. **Denial of Petitioner's Insufficient Evidence Claim Was Not Objectively Unreasonable**

Petitioner first contends the evidence adduced at trial is insufficient to support the claim that Petitioner was at the scene of the carjacking and shooting. (Doc. 1 at 24.) Petitioner alleges that because there was contradictory evidence as to whether Petitioner was at the scene of the crime, the jury could not have found, beyond a reasonable doubt, that Petitioner was there. (Doc. 18 at 1.)

Petitioner is asking this Court to reweigh the evidence in his favor. However, on habeas review, this Court does not reweigh the evidence presented at trial. Instead, the Court must review the record to determine whether a rational trier of fact could have found Petitioner was at the scene of the crime. Evidence is considered in the light most favorable to the prosecution, and it is assumed

that the jury weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in a manner that supports the verdict. *Jackson*, 443 U.S. at 319. Accordingly, if the facts support conflicting inferences, the reviewing court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any conflicts in favor of the prosecution, and must defer to that resolution." *Id*. at 326.

Here, the victim of the crime, Garcia, testified that Petitioner sat in the bed of the pickup truck and when the truck stopped, Petitioner got out of the truck bed. An eyewitness also claimed he saw Petitioner pull Garcia out of the truck, place him on the ground, and drive away. By contrast, several witnesses testified Petitioner could not have been at the scene of the crime, because he was at his mother's house.

When a defendant is "able to cross-examine the eyewitnesses and to argue to the trier of fact that the discrepancies in their identifications made those identifications unreliable," the "trier of fact then ha[s] the responsibility of determining whether the identifications were credible." *United States v. Ginn*, 87 F.3d 367, 369 (9th Cir. 1996) (citing *United States v. Alexander*, 48 F.3d 1477, 1490-91 (9th Cir. 1995)). A reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Walters v. Maas*, 45 F.3d 1355, 1358 (9th Cir. 1995).

Here, the jury was presented with all the evidence, including the contradictory eyewitness statements. The jury assessed the credibility of the witnesses and determined Garcia's testimony was credible. "[T]he assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). Based on this standard, the Court cannot say it was unreasonable for the Court of Appeal to find there was sufficient evidence to support the claim that Petitioner was at the scene of the crime.

Petitioner next argues that even assuming he was at the scene of the crime, there was insufficient evidence to find he aided and abetted or was a conspirator in committing the crimes. (Doc. 1 at 24.) Petitioner alleges that his "mere presence in the vehicle was insufficient to support a finding of any of the necessary elements of aiding and abetting." (Doc. 1 at 25.)

Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. *People v. Lee*, 31 Cal.4th 613, 623 (2003). As an aider and abettor, the person must aid or encourage the perpetrator "with knowledge of the criminal purpose of the direct perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of the crime in question." *Id*. at 624 (internal citation and quotation marks omitted) (emphasis in original).

The Court of Appeal found the attack on Garcia "appeared to be coordinated" because Petitioner was riding in the bed of Garcia's truck and when Magallenas asked Garcia to stop the car and then shot Garcia, Petitioner jumped out of the truck bed, and pulled Garcia out of the truck. The Court of Appeal also relied on a hypothetical posed to the gang expert, Derington:

> Based on the hypothetical mirroring of the People's evidence, Derington opined the attempted murder and carjacking of Pablo Garcia was committed for the purposes of the Northerner gang. She specifically believed the blue hat Garcia was wearing created the perception he was a rival gang member, and "one of the cardinal rules within the gang is . . . to take out any and all rivals sighted at the time." Derington also testified homicide and carjacking were among the crimes committed for the benefit of the gang.

*Perez*, 2016 WL 4014071, at *10.

Based on the evidence that Petitioner was in the truck and "reasonable inferences . . . drawn from th[e] evidence," the Court of Appeal found Magallenas and "Petitioner acted in a well-coordinated conspiracy to attempt to kill [ ] Garcia and carjack his vehicle." *Id*. at *11.

As the California Court of Appeal found, the jury was presented with sufficient evidence from which it could reasonably infer Petitioner had the intent to kill Garcia. Magellenas, Petitioner, and another member of the Northerners gang got into Garcia's truck. After Magallenas shot Garcia, a witness saw Petitioner get out of the truck bed and pull Garcia out of the truck.

The jury heard evidence that the victim was shot based on gang rivalry. Derington, a gang expert, testified that Northerners, Petitioner's gang, wore red and their rivals, the Southerners, wore blue. Garcia was wearing a blue hat at the time the crimes were committed. Derington told the jury that a person living near a Northerner gang member who wore blue, could be perceived as a member of a rival gang. Garcia could also have been perceived as a member of a rival gang because he lived close to a Northerner gang member, but did not associate with the gang member. Derington testified that she believed the blue hat Garcia was wearing "created the perception he was a rival gang member, and 'one of the cardinal rules within the gang is . . . to take out any and all rivals sighted at that time.'" *Id*. at *10.

Petitioner contends that the shooting had to be a "spontaneous[,] unilateral decision" on the part of Magallenas when he saw Garcia wearing a blue hat, and could not have been "the product of a conspiracy or plan involving [P]etitioner." (Doc. 1 at 25.) Petitioner states he could not have known that someone wearing a blue hat would pick them up and "once Magallenas got inside the cab of the truck with Garcia, Magallenas had no means to communicate with the two men in the bed of the truck." *Id*.

Even without evidence of an explicit plan to hunt for rival gang members, the evidence demonstrated that Garcia lived next door to a known Northerner gang member, Medrano, and did not associate with Medrano. On May 8, 2011, Garcia was wearing a blue hat, which is associated with the Northerners' rival gang. Magallenas stopped Garcia's truck as Garcia was driving by Medrano's house and asked for a ride for himself and his two friends, including Petitioner.

Derington testified that Northerners were supposed to "take out" any rivals that they saw. From this evidence, the jury could reasonably infer that Magallenas, Garcia, and the third gang member saw Garcia in his blue hat and stopped him in order to "take him out."

"Among the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense." *In re Juan*, 112 Cal.App.4th 1, 5 (2003). Once Magallenas shot Garcia, instead of running away, Petitioner pulled Garcia out of the truck and Petitioner got into the truck and drove away. Taken as a whole, the actions and conduct of Petitioner and Magallenas established that both men were working together and shared the same intent. Therefore, the lack of evidence of an explicit plan to hunt a rival gang member does not demonstrate that there was insufficient evidence of Petitioner's intent to aid and abet the shooting.

Petitioner also alleges there was insufficient evidence adduced at trial to show that Petitioner committed the carjacking. There was conflicting evidence as to who pulled Garcia out of the car and drove away with the truck. Garcia testified it was Petitioner, while other witnesses testified they did not see Petitioner pull Garcia from the truck. The jury assessed the credibility of the witnesses and determined Garcia's testimony was credible. Therefore, the Court cannot say there was insufficient evidence that Petitioner committed the carjacking.

The Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. For these reasons, the undersigned recommends denying Petitioner's claim that there was insufficient evidence to support a finding that Petitioner aided and abetted an attempted murder and committed a carjacking.

## IV.   The State Court Did Not Err in Denying Petitioner's Motion for Separate Trials

In his second ground for relief, Petitioner alleges the trial court improperly joined the two cases of the shootings of Gonzalez and Almaguer in January 2011, and the shooting and carjacking of Garcia in May 2011.  (Doc. 1 at 26-35.)

### A.  State Court of Appeal Opinion

The California Court of Appeal rejected Petitioner's claim that the state court improperly joined two cases against Petitioner:

> [Petitioner] initially concedes joinder was permissible because murder and attempted murder are crimes of the same class. [Petitioner] contends, however, the People sought to join two weak cases, sought the introduction of a completely irrelevant uncharged crime, and attempted to consolidate two cases without cross-admissible evidence.  [Petitioner] argues he was denied due process by the consolidation of the murder and attempted murder cases.  We find the trial court did not abuse its discretion in joining the two cases.

### B.  Motion to Consolidate

> The prosecutor moved prior to trial to consolidate the Gonzalez and Almaguer murders with the Pablo Garcia attempted murder and carjacking case.  The prosecutor argued both cases involved the same class of crime; the motive in both crimes was gang related, making evidence in both cases cross-admissible; evidence in the shooting of Garcia could be used to prove elements of charged gang offenses, enhancements, and special circumstance allegations in the double murder case; several of the same witnesses would testify in both cases; evidence of the shooting of Garcia was admissible under Evidence Code section 1101, subdivision (b) in the double murder case to show motive, intend, and identity; and trying both cases separately would involve an undue consumption of time.

> In his opposition, [Petitioner] argued the two cases were not cross-admissible because no gang enhancements or crimes were alleged in the attempted murder information and a gang expert would not be permitted to give an opinion in that case; both cases were weak and joining them could result in a different outcome than if they were tried separately; the two cases did not have many common witnesses; there were insufficient similarities to show common scheme, plan, intent, or motive; and consolidation would violate Evidence Code section 352 because it would confuse the issues and substantially prejudice [Petitioner].

> The prosecutor replied gang evidence in the attempted murder case was admissible even if no gang allegations or crimes were alleged in that case.  The prosecutor further argued cross-admissibility was only one factor to consider when ruling on a consolidation motion.

The law and motion court made the following findings at the conclusion of the hearing on May 17, 2013. The court noted the gang evidence appeared to be very strong in both cases, and the motive in both cases appeared to be gang related. The court rejected [Petitioner]'s argument there were no gang allegations in the attempted murder case because even without allegations, gang evidence could still be relevant to the attempted murder case. The court observed both cases had a number of similarities; both involved gang motivation, the use of firearms, and the taking of vehicles. The court noted the identity of the shooter in the attempted murder case did not impose a great consequence on [Petitioner], and the court also stated there was no significance in the People's failure to file other charges in the attempted murder case. The court found there was evidence in each case relevant to the other based on Evidence Code section 1101,[4] making the evidence in each case cross-admissible. The court granted the People's consolidation motion.

## C. Legal Principles

Section 954 governs joinder and severance. It provides, in relevant part, "[a]n accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated . . .; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately. . . ." When the statutory requirements for joinder are satisfied, a defendant has the burden to clearly establish a potential of prejudice sufficient to warrant separate trials. (*People v. McKinnon* (2011) 52 Cal.4th 610, 630.)

Murder and attempted murder are both assaultive crimes against the person and are, therefore, offenses of the same class expressly made joinable by section 954. Where, as here, the statutory requirements of joinder are met, a defendant can predicate error only upon a clear showing of prejudice. (*People v. Miller* (1990) 50 Cal.3d 954, 987, see *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 [consolidation or joinder of charged offenses ordinarily promotes efficiency, the course of action preferred by the law].)

The California Supreme Court has held that while cross-admissibility ordinarily dispels any inference of prejudice, the court has never held the absence of cross-admissibility, by itself, sufficed to demonstrate prejudice. (*People v. McKinnon*,

---

[4] Pursuant to California Evidence Code 1101:

    (a)  . . . [E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

    (b)  Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his or her disposition to commit such an act.

*supra*, 52 Cal.4th at p. 630.)  The absence of cross-admissibility alone is insufficient to establish prejudice where (1) the cases are properly joinable under section 954 and (2) no other factor relevant to the assessment of prejudice shows an abuse of discretion.  (*McKinnon*, at pp. 630-631.)

If the court's joinder ruling was proper at the time it was made, a reviewing court may reverse a judgment only on a showing the joinder resulted in gross unfairness – a denial of due process.  Even if the court abused its discretion in joining or refusing to sever, reversal is unwarranted unless a defendant would have received a more favorable result in a separate trial to a reasonable probability.  (*People v. Avila* (2006) 38 Cal.4th 491, 575.)  The refusal to sever an action, or in this case the joinder of two actions, may constitute an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a weak case has been joined with a strong case or with another weak case; (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.  (*People v. Sandoval* (1992) 4 Cal.4th 155, 172-173 (*Sandoval*).)

## D.  Cross-Admissibility of Evidence

[Petitioner] reargues the entire factual profile of the prosecution's case, discounting most of the evidence adduced at trial.  [Petitioner] finds no cross-admissible evidence in the murder and attempted murder cases.  [Petitioner] points to the evidence from his family members establishing his alibi for the attempted murder of Pablo Garcia and vigorously asserts both cases were weak. [Petitioner] also finds no similarity in the other-crimes evidence in the attempted murder of Sarabia. Before reaching these points, we note [Petitioner] has done the reverse of what a reviewing court is charged to do; he has viewed the evidence in the light most favorable to his contentions and not in the light most favorable to the prosecution's case and verdict.

We conclude the evidence in the double murder case was cross-admissible with evidence in the attempted murder of Pablo Garcia.  It was alleged the murders of Almaguer and Gonzalez were committed while [Petitioner] was an active participant in a criminal street gang and were carried out to further the activities of the gang (§ 190.2, subd. (a)(22)); they were committed for the benefit of a criminal street gang, the gang enhancement allegation (§ 186.22, subd. (b)(4)).  [Petitioner] was further charged with being a principal in the murders who intentionally discharged a firearm (§ 12022.53, subds. (d), (e)(1)) and [Petitioner] was charged with being involved in a criminal street gang conspiracy (§ 182.5).

The attempted murder and carjacking of Pablo Garcia was admissible in the double murder case to show [Petitioner] was an active member in the Northerner gang, that murder and carjacking were among the gang's primary activities, and that both crimes were carried out to further the activities of the gang, as well as to promote, further, or assist the gang's criminal conduct.  [Petitioner]'s activities in both cases formed part of the basis for the opinion of the gang expert, Sergeant Derington, concerning [Petitioner]'s motive for the double murder and the attempted murder.

21

In granting the People's motion to consolidate both cases, the trial court found evidence in both cases was cross-admissible pursuant to Evidence Code section 1101, subdivision (b) as evidence of motive, common plan and scheme, and intent. In both cases, the common motive for the crime was either to kill someone who dropped out of the gang and showed it disrespect – Ignacio Gonzalez – or to kill someone who was believed to be the member of the rival Sureño gang by wearing its representative color in the form of a blue hat – Pablo Garcia. The People accurately evaluate the prosecution evidence adduced at trial as establishing [Petitioner] acted with these overarching goals of the gang with the clear purpose of eliminating gang dropouts, snitches, and rival gang members. The first factor identified in *Sandoval* as showing a potential abuse of discretion, absence of cross-admissible evidence, is not present.

**E. Similarity of the Cases**

[Petitioner] argues the facts of the double murder and attempted murder are totally dissimilar. [Petitioner] further argues the dissimilarities are exacerbated by the even more dissimilar uncharged crime of the attempted murder of Efrain Sarabia. There are several key similarities between all three cases. A Chevrolet Cobalt was stolen in the double murder case and Elena Becerra saw [Petitioner] get into it after the shootings. In the attempted murder of Pablo Garcia, his truck was stolen after he was shot and left for dead in the street. Both cases occurred to retaliate against a former gang member who had cooperated with the police or someone perceived to be a rival gang member.

The attempted murder of Sarabia was very similar to the double homicide. After leaving the gang, Sarabia had fights with gang members in much the same manner as what happened with Gonzalez. [Petitioner] and a fellow gang member sprayed gunfire at Sarabia, injuring the 14-year-old bystander and nearly killing Sarabia. Almaguer and Gonzalez were sprayed with gunfire and a bystander was also shot. [Petitioner] used a stolen Yukon SUV for the Sarabia crime and a stolen Chevrolet Cobalt for the double murder.

[Petitioner]'s attempt to characterize the cases as being factually dissimilar is unpersuasive. We note there are several factual similarities in the charged offenses, including gang motivation, for committing all of the crimes. We reject [Petitioner]'s contention this evidence, including the uncharged attempted murder of Sarabia, was introduced to inflame the passions of the jury. The second *Sandoval* factor is not applicable to this case.

**F. Strength of the People's Case**

[Petitioner] contends the prosecution's case was weak in both cases. Ignacio Gonzalez's mother, Elena Becerra, heard multiple gunshots and ran out of the house. She saw men running toward a van. [Petitioner] was one of the men running away. He looked straight at Becerra. Becerra recognized [Petitioner] because he used to pick up Gonzalez to play basketball. [Petitioner] walked around the van and got into another car. Both vehicles drove away in different directions.

22

Northerner gang member Macias talked to his friend Prieto prior to the shootings and said they were going to "smoke" Gonzalez's ass and referred to Gonzalez as a dead man walking. Later, Macias all but admitted his gang killed Gonzalez. Angel Gutierrez provided guns to [Petitioner] and Alcaraz the day of the shooting and was aware there was a "green light" in the gang to kill Gonzalez. Uriel Uribe learned shortly after the shootings that [Petitioner] had shot and killed Almaguer, and gang member Valdez simultaneously shot and killed Gonzalez.

At Humberto Garcia's apartment, Uribe heard [Petitioner] say Valdez shot Gonzalez in the face. Valdez was laughing. [Petitioner] also said he and Valdez approached Gonzalez's residence from the rear, jumped over the fence, shot the victim, and left the scene in a stolen vehicle. [Petitioner] said they burned their clothes together with the stolen vehicle at Avenue 24. [Petitioner] described the gun he used as "very strong." [Petitioner] said "the [dropouts] thought they were cool chilling outside their house."

The strength of the People's second case against [Petitioner] was also strong, but had less corroborating evidence. Pablo Garcia picked up [Petitioner], Magallenas, and an unidentified third person. In a coordinated action, Magallenas had Garcia stop his truck, then he exited the cab of the truck and walked around to the driver's door. At the same time, [Petitioner] jumped out of the bed of the truck on the driver's side. Magallenas opened the driver's door and shot Garcia in the neck. Lupe Lopez, Jr., told Sergeant Zaragoza he saw a black truck occupied by two people in the cab and one in the bed of the truck. It was too dark to see faces, but the truck stopped in the middle of the block. The person sitting in the bed of the truck jumped out, approached the driver's side door, pulled the driver from the truck, and left the scene in the truck.

There was contradictory testimony on some points, such as whether the person Lupe Lopez, Jr., saw taking Pablo Garcia out of the truck and driving away with it exited from the cab of the truck or from the truck bed. Lopez's account to Sergeant Zaragoza was most consistent with Garcia's testimony.

Neither case was perfect, but we reject [Petitioner]'s contention both cases were weak. Both cases were relatively strong and involved the same class of offense. The third factor identified in *Sandoval* as showing a potential abuse in the trial court's discretion in consolidating both cases, matching a strong case with a weak case or matching two weak cases, is not present. [N. 4]

> [N.4] The fourth *Sandoval* factor indicating an abuse of discretion in ruling on a severance of consolidation motion is when any of the charges carries the death penalty or joinder of them turns the matter into a capital case. (*Sandoval*, *supra*, 4 Cal.4th at pp. 172-173.) [Petitioner] was never charged with the death penalty.

**G. Conclusion**

[Petitioner] initially conceded joinder was permissible because murder and attempted murder are crimes of the same class. [Petitioner] bore the burden of showing the trial court's consolidation of the two cases denied him of his right to due process and had a fair trial. Not present in this case are the three factors identified in *Sandoval* as showing a court abused its discretion in granting a motion to consolidate or denying a motion to sever two or more cases. There was cross-admissible evidence, both cases were relatively strong, and the evidence of each case was not presented to unduly inflame the passions of the jury. We therefore find no error in the trial court's order consolidating both cases.

*Perez*, 2016 WL 4014071, at *11-14.

**B. The State Court Did not Err in Rejecting Petitioner's Motion to Sever Claims**

To the extent Petitioner's claim involves the trial court's misapplication of California's laws regarding joinder, the claim is not cognizable on federal habeas review, because it involves only an alleged error of state law. "It is not the province of a federal court to reexamine state court determinations of state law questions." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Habeas relief is not available for an alleged error in the application of state law. *Id*. at 68.

There is no clearly established Federal law that holds the joinder or consolidation of charges violates the Constitution. In *United States v. Lane*, the United States Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." 474 U.S. 438, 446 n.8 (1986).

However, the Ninth Circuit has stated:

*Lane* considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and expressly stated that no constitutional claim had been presented. *See Lane*, 474 U.S. 438, 446 & n.9 . . . . Thus, *Lane*'s broad statement – found in a footnote without citation to any legal authority – that misjoinder could only rise to the level of a constitutional violation if it was so prejudicial as to violate due process, was probably dictum. Only Supreme Court holdings are controlling when reviewing state court holdings under 28 U.S.C. §2254; Court dicta and circuit court authority may not provide the basis for granting habeas relief. *Lockyer v. Andrade*, 538 U.S. 63, 71-2 . . . (2003).

24

*Young v. Pliler*, 273 Fed. Appx. 670, 672 n.1 (9th Cir. 2008).

Because the statement from *Lane* is dicta, *Lane* does not set forth a governing legal principle, and does not constitute clearly established federal law, with regard to when severance is constitutionally mandated. *Collins v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2010); *see also Carey v. Musladin*, 549 U.S. 70, 74 (2006) (restricting "clearly established federal law" under § 2254 to holdings of the Supreme Court, rather than dicta). For these reasons, the Court of Appeal's rejection of Petitioner's severance claim could not have been an unreasonable application of clearly established federal law.

Prior to *Collins*, the Ninth Circuit held undue prejudice from misjoinder existed only "if the permissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000). "In evaluating prejudice, the Ninth Circuit focuses particularly on cross-admissibility of evidence and the danger of 'spillover' from one charge to another, especially where one charge or set of charges is weaker than another." *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). The risk of prejudice increases "whenever joinder of counts allows evidence of other crimes to be introduced in a trial where the evidence would otherwise be inadmissible." *Sandoval*, 241 F.3d at 772.

Petitioner alleges the two cases were improperly joined because evidence in the cases were not cross-admissible, the cases were weak individually, and joining the cases was "unusually likely" to inflame the jury against Petitioner. (Doc. 1 at 28-34.)

However, the California Court of Appeal reasonably concluded that Petitioner suffered no prejudice from the trial court's decision to join the two cases against him. The Court of Appeal found the evidence in the cases were cross-admissible pursuant to California Evidence Code § 1101(b) as evidence of motive, common plan and scheme, and intent. *Perez*, 2016 WL 4014071, at *13. Evidence of both shootings showed Petitioner was an active participant in the Northerners

gang and the shootings were carried out to further the activities of the gang and for the benefit of the gang. *Id*.

Petitioner claims that joining the two cases allowed two weak cases to become a stronger case. Petitioner alleges the "consolidation combined the extremely weak, if not wholly insufficient, Garcia incident with the double murder case, which was also based on questionable evidence." (Doc. 1 at 32.) As the California Court of Appeal noted, Petitioner asks the Court to re-evaluate the evidence presented at trial in the light most favorable to Petitioner. *Perez*, 2016 WL 4014071, at *12. However, on habeas review, evidence is considered in the light most favorable to the prosecution, and it is assumed that the jury weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in a manner that supports the verdict. *Jackson*, 443 U.S. at 319.

Eyewitness testimony placed Petitioner at both crime scenes as one of the shooters at the double murder and as the person that pulled Garcia out of his truck and drove off with the truck during the attempted murder and carjacking. While several witnesses testified Petitioner could not have been at either crime scene, the jury was tasked with determining the credibility of the witnesses and found the witnesses who placed Petitioner at the crime scenes as more credible. Given the eyewitness statements, both cases were strong on their own.

Finally, Petitioner claims joining the two cases was "'unusually likely' to inflame the jury against" Petitioner, because joining the cases created a "piling-on effect." (Doc. 1 at 34-35.) However, the jury was instructed that "[e]ach of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." (Lodged Doc. 11 at 1203.) There was no indication that the jury was unable to follow the instructions, and the Court presumes the jury followed the jury instructions. *Doe v. Busby*, 661 F.3d 1001, 1017-18 (2011) (internal citations omitted).

Based on the foregoing, the undersigned recommends finding that the Court of Appeal's rejection of Petitioner's claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Consequently, federal habeas relief is not warranted on this claim, and should be denied.

## V. The State Court Did Not Err in Denying Petitioner's Prosecutorial Misconduct Claims

In his third ground for habeas relief, Petitioner contends the prosecutor committed misconduct by questioning an unsworn witness in violation of the Confrontation Clause. (Doc. 1 at 35-36.) Further, Petitioner claims the trial court erred in denying Petitioner's motion for a mistrial after the prosecutor improperly questioned a witness. *Id*. at 36. Respondent responds that Petitioner is procedurally barred from raising the prosecutorial misconduct claim and no Supreme Court precedent supports his claims. (Doc. 8 at 32.)

### A. Standard of Review

A prosecutor's improper comments will be held to violate Constitutional rights only if the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (per curiam) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Prosecutorial misconduct violates the Due Process guarantee of a fair trial if it prejudicially affects the rights of the defendant. *United States v. Yarbrough*, 852 F.2d 1522, 1539 (9th Cir. 1988) (citing *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

The Court must determine whether the alleged misconduct by the prosecutor rendered the trial fundamentally unfair. *Darden*, 477 U.S. at 183. To grant habeas relief, the Court must find that the state court's rejection of the prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47 (quoting *Harrington*, 562 U.S. at 103).

## B. **State Court of Appeal Opinion**

The California Court of Appeal rejected Petitioner's prosecutorial misconduct claims, as follows:

> [Petitioner] argues there was no compliance with Evidence Code section 710, which requires a witness to take an oath or affirmation prior to giving testimony. [Petitioner] further argues the failure of the witness Carlos Infante to take an oath also violated the confrontation clause of the Sixth Amendment. [Petitioner] contends the prosecutor committed misconduct by questioning Infante after he refused to take the oath to tell the truth in violation of the trial court's order. [Petitioner] further contends the prosecutor was allowed to get information before the jury concerning [Petitioner]'s alleged confession to Infante that he was guilty of the double murder. [Petitioner] states he was denied due process and the trial court erred in denying his motion for a mistrial on this ground.

> The People reply [Petitioner] failed to raise any objections based on Evidence Code 710 and the confrontation clause, and this issue was therefore forfeited. As we explain, [Petitioner] did not object to the failure to swear Infante on Evidence Code and confrontation clause grounds related to a witness taking an oath. Defense counsel, however, did not object to the prosecutor's questioning of Infante as bringing in evidence of a confession through the "back door," another aspect of the confrontation clause, and did make a motion for mistrial based on prosecutorial misconduct, preserving these issues for appellate court review. We do not find error on these grounds.

## B. **Attempted Questioning of Carlos Infante**

> Although the prosecutor called Carlos Infante as a witness, Infante refused to be sworn in or to answer any questions. After refusing to be sworn as a witness, the prosecutor asked Infante the following: "On March 26, 2013, did you tell Investigator Denny that you knew [Petitioner] since he was a little boy and that [Petitioner] told you that [he] along with Red and a third guy killed the victims –" Defense counsel immediately objected before the prosecutor could finish his question. The prosecutor continued with his question: " – with a 9-millimeter gun at State and Washington because they were rats or in a gang?"

> Defense counsel immediately lodged a second objection. The trial court replied, "Objection sustained. That question is stricken." The court then advised the jury, "When I strike something, you're to assume it didn't happen." The court noted the prosecutor's question was compound. The court cut off the prosecutor and asked Infante, "On March 26, 2013, did you talk to Investigator Denny?" Infante replied, "I don't want to say anything. I am not going to say anything."

> The attorneys proceeded to have a discussion with the court outside the jury's presence. Defense counsel stated the prosecutor's question of what Infante told an investigator allowed the jury to hear information through the black door. Defense counsel argued the court had told the prosecutor not to question the witness under these circumstances, and he made a motion for a mistrial based on prosecutorial misconduct. The prosecutor argued he was permitted to ask a leading question, there was nothing wrong with his question, and the only way to determine whether Infante would testify was to ask him the question. The prosecutor told the court that not allowing him to question Infante was prejudicial to the People's case.

The trial court responded: "Stop, stop. You're not going to ask the question. [¶] I asked a question whether or not he talked to the officer, and he refused to answer that. So, it's obvious he's refusing to answer any questions, and we are done with this witness." The court denied defense counsel's motion for a mistrial, and the jury was brought back into court.

The court ordered Infante to answer relevant questions. Infante again said he had nothing to say and refused to answer any question put to him. The court advised Infante it would hold him in contempt if he continued to refuse to answer questions. Infante refused to answer questions and the court found him in contempt.

Later, defense counsel sought to clarify the record concerning what the trial court told the prosecutor prior to calling Infante to the witness stand. Defense counsel said it was his recollection he had expressed concerns to the court about the nature of the question to be asked by the prosecutor. Defense counsel had asked the court if it agreed with him on that point. Counsel was unsure if the court actually told the prosecutor not to ask questions. The prosecutor stated he believed he could ask Infante a leading question based on reports Infante was not going to cooperate with questioning.

The court explained its understanding was the prosecutor could ask one leading question, anticipating Infante would not answer it. The court stated, "That is why in the middle of the prosecution's question I interrupted and moved to strike the question." Defense counsel said he wanted to discuss this point to put his mistrial motion in context. The court replied there was nothing significant, given the fact only question, and the court immediately struck it with an admonition to the jury to disregard it.

## C. Failure to Swear Witness

[Petitioner] argues the trial court erred in permitting the prosecutor to ask Infante any questions after Infante refused to be sworn, asserting a violation of Evidence Code section 710 and the confrontation clause of the Sixth Amendment of the United States Constitution. The People reply defense counsel did not object to Infante's testimony on this basis and the issue is forfeited.

The central concern of the confrontation clause is to safeguard the reliability of evidence against a criminal defendant by subjecting it to rigorous testing, ensuring the witness gives his or her statements under oath – impressing on the witness the seriousness of the matter, forcing the witness to submit to cross-examination, and permitting the jury deciding the defendant's fate to observe the demeanor of the witness, thus aiding the jury in assessing the witness's credibility. (*Maryland v. Craig* (1990) 497 U.S. 836, 845-846.) Evidence Code section 710 requires "[e]very witness before testifying shall take an oath or make an affirmation or declaration in the form provided by law, except that a child under the age of 10 or a dependent person with a substantial cognitive impairment, in the court's discretion, may be required only to promise to tell the truth."

Generally, the failure to object to an evidentiary error at trial results in forfeiture of the issue on appeal. (*People v. Dykes* (2009) 46 Cal.4th 731, 756; *People v. Partida* (2005) 37 Cal.4th 428, 433-435; *People v. Lewis* (2001) 26 Cal.4th 334, 357.) Failure to raise a constitutional objection to evidence can also establish waiver of the issue on appeal. (*People v. Rowland* (1992) 4 Cal.4th 238, 265, fn. 4.) Defense counsel did not specifically object to Infante's presence in court on the basis he had

not been sworn as a witness pursuant to Evidence Code section 710. We find his assertions of a violation of Evidence Code section 710 and the confrontation clause component of this argument are both subject to forfeiture.

Even if we were to carve an exception to the forfeiture and waiver doctrines for the failure of a witness to take an oath, [Petitioner] cannot prevail on this point. Infante refused to take the oath and, more importantly, he refused to answer any question posed by the prosecutor or the court. Infante provided no evidence of anything during his brief stay on the witness stand. Under these circumstances, there was no error in asking Infante a single question without him being sworn. We therefore find no error in the failure to obtain an oath from Infante or a related violation of the confrontation clause based on Infante's failure to take the oath.

## D. Prosecutorial Misconduct

[Petitioner] contends the prosecutor committed misconduct in asking a question suggesting he confessed to Infante he committed the double murder, thus placing extrajudicial information before the jury in violation of the trial court's ruling. This presents another facet of a violation of the confrontation clause defense counsel did not object to. [Petitioner] argues the court had agreed the prosecutor could not ask questions permitting information to come in through the back door, but the prosecutor disregarded the trial court and still asked the question. [Petitioner] describes the prosecutor's conduct as being in contravention of the court's order and, thus, prosecutorial misconduct. [Petitioner] argues the prosecutor improperly interrogated a witness.

Before analyzing the legal principles applicable to prosecutorial misconduct, we first note the following concerning how the trial court ruled. In the hearing after Infante was called to the stand, the court explained its understanding was the prosecutor could ask one leading question anticipating that Infante would not answer it. The court stated, "That is why in the middle of the prosecution's question I interrupted and moved to strike the question." Defense counsel said he wanted to discuss this point to put his mistrial motion in context. The court replied there was nothing significant, given the fact only a partial question was presented by the People, the witness did not answer the question, and the court immediately struck it with an admonition to the jury to disregard it.

The prosecutor and the trial court apparently understood the prosecutor would ask Infante one leading question to determine whether Infante indeed intended not to testify. The prosecutor's single attempted question did not, by itself, violate any prior ruling of the trial court. Infante was not invoking his privilege against self-incrimination and the prosecutor could call him to the witness stand to determine whether he would testify. (See *People v. Sisneros* (2009) 174 Cal.App.4th 142, 151, questioned on another ground in *People v. Sanchez* (June 30, 2016, S216681) – Cal.4th –, – [2016 Cal. LEXIS 4577, 2016 WL 3557001 pp. 29-31]; *People v. Lopez* (1999) 71 Cal.App.4th 1550, 1553-1554.) It appears the prosecutor was attempting to either establish whether Infante talked to Investigator Denny regarding an admission [Petitioner] made concerning the double murder, or that Infante would deny making any statement to Denny, permitting the prosecutor to introduce Infante's statement as a prior inconsistent statement pursuant to Evidence Code section 1235. (*People v. Perez* (2016) 243 Cal.App.4th 863, 891 (*Perez*).) Where, as here, the record shows the prosecutor had a good faith belief a witness could establish a factual basis for the questioning posed at trial, no prosecutorial misconduct has occurred. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1232-1234; *People v. Lucas* (1995)12 Cal.4th 415, 466-467.)

30

The more pertinent issue is whether the prosecutor's question violated the confrontation clause by alluding to evidence not otherwise before the jury. The United States Supreme Court in *Douglas v. Alabama* (1965) 380 U.S. 415, 419-421 (*Douglas*) held a prosecutor violated the confrontation rights of a defendant when the prosecutor asked a witness a series of questions concerning the crime charged against the defendant after the witness invoked the right against self-incrimination. The witness was repeatedly asked whether he had made a statement, and he refused to answer the prosecutor's questions. (*Id*. at pp. 416-417.) The court in *Douglas* found the prosecutor's reading of the statement, while technically not testimony, may well have been the equivalent in the jury's mind that the witness made the statement and it was true. (*Id*. at pp. 419-420.)

California cases have relied on *Douglas* to find a defendant's right to confrontation is violated where, in examining a recalcitrant witness, the prosecutor poses leading questions providing the details of prior statements of the witness made to law enforcement regarding a defendant's commission of a crime. A victim-witness's refusal to answer over 100 leading questions while the prosecutor read to the jury from police questionings denied the defendant the opportunity to cross-examine the victim on what was tantamount to adverse testimony in *People v. Murillo* (2014) 231 Cal.App.4th 448, 455-456 (*Murillo*). The admission of a prior statement made by a witness who stonewalled at trial and refused to answer any question on direct or cross-examination denies the defendant the right to confrontation, which contemplates a meaningful opportunity to cross-examine witnesses. (*People v. Rios* (1985) 163 Cal.App.3d 852, 863-864 (*Rios*).)

In *People v. Shipe* (1975) 49 Cal.App.3d 343, 354-355 (*Shipe*), the prosecutor succeeded in creating the distinct impression the witnesses had talked to authorities, had described the events vividly depicted in the prosecutor's questions, and their statements were true. In *Perez, supra*, 243 Cal.App.4th at page 887-890, the case had been remanded for retrial. On retrial, the *Perez* court directed the trial court not to allow the prosecutor to pose numerous questions to a recalcitrant witness concerning the witness's statements to police because this violated *Douglas* and its progeny. The *Perez* court was not persuaded by the People's argument the statements were not themselves testimony, the very argument rejected in *Douglas*. (*Perez, supra*, at p. 887.)

Although the prosecutor's single question here could be considered improper pursuant to *Douglas* and its progeny, there is a material difference in the length of the colloquy between the prosecutor, which was interrupted by defense counsel's objections and the trial court ordering the question stricken, and the persistent questioning that occurred in *Douglas*, *Perez*, *Murillo*, *Rios*, and *Shipe*. Unlike the prosecutors in the referenced cases, the prosecutor here did not have the opportunity to paint a portrait of facts not in evidence through his questioning of Infante. In fact, the prosecutor never got to reformulate his question. The trial court intervened and asked Infante whether he had talked to Investigator Denny on March 26, 2013. Infante refused to answer this question, and Infante was asked no further questions concerning any statement made to Denny.

We further find any potential harm was immediately overcome by the trial court sustaining the objections by defense counsel and ordering the prosecutor's question stricken. Elaborating on its ruling, the trial court further admonished the jury, "When I strike something, you're to assume it didn't happen." The jury received further instructions both at the beginning of trial and in concluding instructions pursuant to CALCRIM Nos. 104 and 222 that nothing the attorneys said was evidence, their remarks are not evidence, their questions are not evidence, and only

the witnesses' answers are evidence. Appellate courts presume the jury followed the trial court's instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.)

We conclude the prosecutor did not willfully violate any prior order of the trial court. To the extent the prosecutor's leading question to Infante contained information not otherwise in evidence, the trial court ameliorated any negative impact by immediately intervening, sustaining defense counsel's objections, striking the question, and ordering the jury that by striking the question it was not to consider any part of the prosecutor's statements. Unlike *Douglas* and the California cases applying it, the prosecutor here did not attempt to get, nor succeed in getting, evidence in through the back door by way of a series of questions creating a portrait of evidence not before the jury. The trial court did not abuse its discretion in denying [Petitioner]'s motion for a mistrial. (See *People v. Ayala* (2000) 23 Cal.4th 225, 283-284.)

*Perez*, 2016 WL 4014071, at *15-18.

## C. <u>Failure to Swear Witness</u>

At trial, the prosecutor called Carlos Infante ("Infante") as a witness. When Infante took the stand, he stated he had nothing to say and refused to take the oath. The following exchange occurred:

| Prosecutor: | On March 26, 2013, did you tell Investigator Denny that you knew [Petitioner] since he was a little boy and that [Petitioner] told you that [Petitioner] along with [Macias] and a third guy killed the victims – |
| --- | --- |
| Defense Counsel: | Objection |
| Prosecutor: | – with a 9-millimeter gun at State and Washington because they were rats or in a gang? |

(Lodged Doc. 7 at 182.)

The trial court sustained the objection, struck the questions, and admonished the jury, stating: "When I strike something, you're to assume it didn't happen." *Id*. at 183. The trial court asked Infante, "On March 26, 2013, did you talk to Investigator Denny?" Infante responded, "I don't want to say anything. I am not going to say anything." *Id*.

The Court held a conference out of the presence of the jury, at which defense counsel asked for a mistrial, arguing:

> I made a specific objection that [the prosecutor] not be allowed to ask questions that allow what [Infante] told an investigator in through the back door in front of this jury, and he told this court before at the bench there he was not gonna do that.
>
> Not only did he do something completely opposite, he basically did through the court's objection 'cause you agreed with me you weren't gonna allow him to do that. That is misconduct, and I am asking for a mistrial because although you say it's been stricken, that hardly and adequately makes up for what he just did.

*Id.* at 184.

The Court denied the motion for a mistrial. *Id.* at 186. The court called Infante back to the stand and ordered him to answer the court's question of whether he had talked to an officer regarding this case. *Id.* at 187. Infante refused to answer any questions, and the court held him in contempt of court. *Id.* at 187-88.

The next day, the court addressed the prosecutor's questioning of Infante, stating,

> it was my understanding, [prosecutor], that I was not going to allow the question – a leading question that would suggest something to the jury that knowing this witness was not going to answer. That is why in the middle of the prosecutor's question, I interrupted and moved to strike the question.

(Lodged Doc. 8 at 336-37.)

The court stated the prosecutor's question was insufficient to warrant a mistrial, given that it was a partial question that the witness did not answer, and the court immediately struck the question and admonished the jury to disregard it. *Id.* at 337

Petitioner contends the prosecutor committed misconduct by questioning Infante after Infante refused to take the oath. (Doc. 1 at 37-38.) The California Court of Appeal held Petitioner was procedurally barred from raising this claim on appeal, because he did not object at trial.

A federal court cannot review claims in a petition for writ of habeas corpus if a state court denied relief on the claims based on state law procedural grounds that are independent of federal law and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted

on the particular state's procedural requirements." *Park v. California*, 202 F.3d 1146, 1150 (2000).

A petitioner procedurally defaults his claim if he fails to comply with a state procedural rule or fails to raise his claim at the state level. *Peterson v. Lampert*, 319 F.3d 1153, 1156 (9th Cir. 2003) (citing *O'Sullivan v. Boerckel*, 562 U.S. 838, 844-45 (1999)). The procedural default doctrine applies when a state court determination of default is based in state law that is both adequate to support the judgment and independent of federal law. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). An adequate rule is one that is "firmly established and regularly followed." *Id.* (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)); *Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2003). An independent rule is one that is not "interwoven with federal law." *Park*, 202 F.3d 1146 at 1152 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).

When a state prisoner has defaulted on his federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred, unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

California's procedural default rule is independent of federal law. *See Tran v. Sherman*, No. 1:15-cv-00716-LJO, 2015 WL 510879 at *1 (E.D. Cal. Aug. 31, 2015); *Sanchez v. Ryan*, 392 F. Supp. 2d 1136, 1138-39 (C.D. Cal. 2005); *Protsman v. Pliler*, 318 F. Supp. 2d 1004, 1007-08 (S.D. Ca. 2004). Consequently, because the California Court of Appeal's denial was based on an independent state procedural rule, denial of the petition was on independent state law grounds.

Petitioner claims there was not an adequate state ground to procedurally bar this Court from reviewing the claim, because "California law holds that a reviewing court may exercise discretionary authority to review non-evidentiary claims on the merits, even in the absence of an objection." (Doc. 187 at 7) (citing *People v. Williams*, 17 Cal.4th 148, 161, fn.6 (1998)). A state

law ground is "adequate" if it is "'firmly established and regularly followed' at the time it was applied by the state court." *Poland v. Stewart*, 169 F.3d 573, 577 (9th Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 424 (1991)). While Petitioner finds cases where California courts have reviewed claims in the absence of an objection during trial, these cases are the exception rather than the rule. California's procedural default rule is "regularly followed."

California's procedural default rule is established and followed in California state courts; therefore, the procedural ground was adequately applied and bars federal review by this Court. *See Sanchez*, 392 F. Supp. 2d at 1138-39; *Protsman*, 318 F. Supp. 2d at 1008. Based on the foregoing, California's procedural default rule is adequate and independent.

Petitioner alleges he was prejudiced by the prosecutor's questions to Infante after he refused to take an oath and his Sixth Amendment right to confrontation was violated. Confrontation Clause rights may be waived. *See e.g. Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313 n.3 (2009) ("The right to confrontation may, of course, be waived, including by failure to object to the offending evidence . . ."); *Godinez v. Moran*, 509 U.S. 389, 399 (1993) (noting that a defendant may waive his right of confrontation); *United States v. Gamba*, 541 F.3d 895, 900 (9th Cir. 2008) (counsel may deliberately and as a result of trial tactics and strategy waive defendant's Sixth Amendment right to cross-examination and confrontation).

Here, Petitioner's trial counsel did not object to Infante taking the stand without being sworn, but did object to the question the prosecutor posed to Infante. The Court will discuss the potential prejudice of the prosecutor's question, *infra*.

### D. The Prosecutor's Question to Infante

Petitioner alleges the prosecutor engaged in misconduct by violating the trial court's order not to ask questions regarding Infante's statement to investigators and contends that asking the question presented prejudicial evidence to the jury. (Doc. 1 at 38-40.) Respondent responds that

35

no Supreme Court case clearly holds that a prosecutor's violation of a court order violates a Petitioner's due process rights. (Doc. 8 at 42-44.)

The Court must determine whether the prosecutor's question "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker*, 567 U.S. at 45 (2012) (quoting *Darden*, 477 U.S. at 181). The California Court of Appeal found there was no harm, because the prosecutor asked a single question and "any potential harm was immediately overcome by the trial court sustaining the objections by defense counsel and order the prosecutor's question stricken." *Perez*, 2016 WL 4014071, at *18.

Petitioner cites *Hardnett v. Marshall*, 25 F.3d 875 (9th Cir. 1994), in which the Ninth Circuit held a prosecutor engaged in misconduct by violating the defendant's rights under the Confrontation Clause. In cross examining a defendant, the prosecutor introduced "in the form of questions" out of court statements in violation of a trial court order. *Id*. at 879. The prosecutor asked the defendant four questions about a co-defendant's statements to police. *Id*. at 878. Defense counsel objected to each question and the court sustained each objection. After the fourth questions, the Court told the prosecutor not to "make reference to a witness' statement – this is the witness who's testifying – or alleged statement." *Id*. During jury instructions, the court instructed the jury that the statements of the lawyers were not evidence. The Court held that "[w]here misconduct has been as blatant as [the prosecutor's] was, and the inadmissible testimony as relevant as it was here, we cannot presume that the jury paid no attention to it, rather, we adopt the realistic view of the First Circuit that the kind of impression made could not be cured by an instruction." *Id*.

The case at bar is distinguishable from *Hardnett*. Here, the prosecutor asked Infante *one* question—to which defense counsel objected. The court sustained the objection and immediately instructed the jury to disregard the question. The jury was also instructed that nothing the attorney

36

said was evidence and that their questions were not evidence. "When a defendant contends that a prosecutor's question rendered his trial fundamentally unfair, it is important 'as an initial matter to place th[e] remar[k] in context.'" *Greer v. Miller*, 483 U.S. 756, 766 (quoting *Darden*, 477 U.S. at 179). Here, where there was "a single question, an immediate objection" and a curative instruction, there was no violation of Petitioner's due process rights. *Id.*

Finally, Petitioner contends the trial court denied him his due process rights by denying his motion for a mistrial because "[t]he prosecutor's leading question was incurably prejudicial." The undersigned has already found the question was not "incurably prejudicial"; therefore, it recommends denying Petitioner's claim.

## VI.   Jury Instruction Errors

In his fourth ground for habeas relief, Petitioner alleges the trial court erred by failing to instruct the jury on accomplice testimony and other-crimes evidence.

### A.   Federal Habeas Review of Jury Instruction Errors

Generally, claims of instructional error are questions of state law and are not cognizable on federal habeas review. "It is not the province of a federal court to reexamine state court determinations of state law questions." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). "The fact that a jury instruction violates state law is not, by itself, a basis for federal habeas corpus relief." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006). "[A] petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997).

A trial court's refusal to give an instruction does not, by itself, raise a cognizable claim under federal habeas review. *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). To prevail in a collateral attack on state court jury instructions, a petitioner must do more than prove that the instruction was erroneous. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The petitioner must

prove that the error "by itself so infected the entire trial that the resulting conviction violated due process." *Estelle*, 502 U.S. at 72. Even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Due process requires "criminal defendants be afforded a meaningful opportunity to present a complete defense." *Clark*, 450 F.3d at 904 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)) (internal quotation marks omitted). Criminal defendants are entitled to adequate instructions on the defense theory of the case; however, Due Process only requires instructions be given when the evidence supports the instruction. *Conde v. Henry*, 198; F.3d 734, 739 (9th Cir. 2000); *Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).

Omitting an instruction is less likely to be prejudicial than misstating the law. *Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson*, 431 U.S. at 155.)

**B. Failure to Give Instruction on Accomplice Testimony**

Petitioner contends the trial court should have instructed the jury as to accomplice liability, pursuant to CALCRIM No. 334, which states that accomplice testimony must be corroborated.[5]

---

[5] CALCRIM No. 334 instructs the jury as follows:

Before you may consider the statement or testimony of [witnesses] as evidence against the defendant, you must decide whether [witnesses] were accomplices.

A person is an accomplice if he or she is subject to prosecution for the identical charge against the defendant. Someone is subject to prosecution if:

1.  He or she personally committed the crime; OR

2.  He or she knew of the criminal purpose of the person who committed the crime; AND

3.  He or she intended to, and did in fact, (aid, facilitate, promote, encourage, or instigate the commission of the crime; or participate in a criminal conspiracy to commit the crime).

The burden is on the defendant to prove that it is more likely than not that [the witnesses] were accomplices.

(Doc 1 at 41-43.)  Respondent responds that there is no clear Supreme Court authority establishing that accomplice testimony must be corroborated.  (Doc. 8 at 37.)

## 1.  **State Court of Appeal Opinion**

The California Court of Appeal rejected Petitioner's claim that the jury should have been instructed as to accomplice testimony:

> [Petitioner] contends the trial court prejudicially erred by failing to instruct the jury on the rules governing accomplice testimony for witnesses Uriel Uribe and Benjamin Semintal.  [Petitioner] argues Uribe and Semintal were both Northerner gang members, and there was evidence from which the jury could have inferred they were accomplices with Macias in the double murder.  The People argue there is no direct evidence from which reasonable inferences could be drawn that Uribe and Semintal acted as accomplices, and accomplice instructions were not warranted for these witnesses.  We agree.
>
> When a jury receives substantial evidence a witness who has implicated the defendant was an accomplice, a trial court must instruct the jury on the principles of accomplice testimony on its own motion.  This includes instructing the jury an

---

An accomplice does not need to be present when the crime is committed.  On the other hand, a person is not an accomplice just because he or she is present at the scene of a crime, even if he or she knows that a crime will be committed or is being committed and does nothing to stop it.

. . .

If you decide that a witness was not an accomplice, then supporting evidence is not required and you should evaluate his or her statement or testimony as you would that of any other witness.  If you decide that a witness was an accomplice, then you may not convict the defendant based on his or her statement or testimony alone.  You may use the testimony of an accomplice to convict the defendant only if:

1.   The accomplice's statement or testimony is supported by other evidence that you believe;

2.   That supporting evidence is independent of the accomplice's testimony; AND

3.   That supporting evidence tends to connect the defendant to the commission of the crimes.


Supporting evidence, however, may be slight.  It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crimes, and it does not need to support every fact about which the accomplice testified.  On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission.  The supporting evidence must tend to connect the defendant to the commission of the crime.

The evidence needed to support the statement or testimony of one accomplice cannot be provided by the testimony of another accomplice.

Any testimony of an accomplice that tends to incriminate the defendant should be viewed with caution.  You may not, however, arbitrarily disregard it.  You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence.

accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence. (*People v. Houston* (2012) 54 Cal.4th 1186, 1223; see CALCRIM Nos. 334, 335.) An accomplice is someone subject to prosecution for the charged crimes by reason of aiding and abetting or being a member of a conspiracy to commit the charged crimes. (*People v. Houston*, *supra*, at p. 1224.) An accomplice is recognized as a tainted source of evidence because he or she has a strong motive to fabricate testimony incriminating innocent persons or attributing to others active roles for more serious offenses so the accomplice might gain leniency or even immunity for his or her own criminal actions. (*In re Mitchell P.* (1978) 22 Cal.3d 946, 955.)

An accomplice must have guilty knowledge and intent with regard to the commission of the crime. An aider and abettor must act with the knowledge of the criminal purpose of the perpetrator and with the intent or purpose either of committing, encouraging, or facilitating commission of the offense. (*People v. Houston*, *supra*, 54 Cal.4th at p. 1224.) Mere presence at the scene of a crime is insufficient to constitute aiding and abetting. The same is true for failure to take action to prevent a crime. However, these may be factors the jury can consider in assessing a defendant's criminal responsibility. Knowledge of another's criminal purpose is also insufficient for aiding and abetting. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530.)

[Petitioner]'s argument that Uribe and Semintal were accomplices is largely based on the prosecutor's argument to the jury that Macias orchestrated the double murder and manufactured an alibi because Gonzalez had "flipped off" Macias earlier the day of the shootings. [Petitioner] surmises that because Uribe and Semintal were with Macias prior to the shootings, they were necessarily accomplices with Macias and [Petitioner].

According to Gutierrez, [Petitioner] and Alcaraz picked up the guns from him at 4:00 p.m. the day of the murders. [N.5] At trial, Gutierrez said the guns were retrieved by [Petitioner] and Alcaraz a few days before the murders. Neither Uribe nor Semintal were with [Petitioner]. Gutierrez said two men he did not know came with Macias the day of the shootings, talked about dropouts, and mentioned Gonzalez. The men talked about beating up Gonzalez. Assuming the two men with Macias were Uribe and Semintal, a discussion about dropouts and beating up Gonzalez in no way links Uribe and Semintal as accomplices to double murder.

> [N.5] The trial court informed counsel the jury would be instructed Gutierrez was an accomplice as a matter of law. The jury received accomplice testimony instructions (CALCRIM No. 335)[6] stating Gutierrez was an accomplice in counts 1 through 5.

The visitors stayed with Gutierrez until after they heard gunshots from the double murder. Macias mentioned a police scanner and the other men appeared nervous. Uribe told an investigator he had learned that earlier in the day gang members went to Gutierrez's home to pick up firearms. It is unclear whether Uribe was aware of this fact prior to the shootings. Gutierrez testified he told Macias, and presumably Uribe and Semintal, the "homies" had picked up firearms earlier that day. This information was imparted after the three men arrived at Gutierrez's home and just before the shootings.

---

[6] CALCRIM No. 335 is the jury instruction given regarding accomplice testimony when there is no dispute whether the witness is an accomplice. CALCRIM No. 334 is given when there is a dispute whether a witness is an accomplice.

Uribe picked up Semintal, drove to Earlimart, and learned Valdez had just dropped off Macias.  Uribe and Semintal drove with Macias past Gonzalez's home and then to Gutierrez's house.  Between 10 and 13 minutes later, they heard gunshots and drove past the crime scene.  Semintal gave a similar account to investigators.  At most, this information does nothing more than place Uribe and Semintal at the scene of the shooting before and after they occurred, and nearby when the double murder happened.  As noted above, however, being at the scene of a crime does not make one an accomplice.

We disagree with [Petitioner]'s assertion the jury would have likely considered them accomplices.  The only connection to the double murder Uribe and Semintal had was their car ride with Macias before and after the shootings.  Thus, tying Uribe and Semintal to the double murder as accomplices would be based on vague speculation, even if one accepts the theory Macias called for Gonzalez's murder.

The cautionary instruction is not necessary when the witness is a mere accessory after the fact of the crime or when the witness does not claim firsthand knowledge of how the crime was committed and only testifies to what he or she heard.  (*People v. Mackey* (2015) 233 Cal.App.4th 32, 123.)  Even where the accomplice testimony rule is violated, the failure to give the instruction is harmless, if there is sufficient corroborating evidence in the record.  The corroborating evidence may be slight.  (*Id.* at p. 124.)  Here, there was abundant evidence corroborating the testimony and prior statement so Uribe and Semintal.  This ground for appeal is rejected.

*Perez*, 2016 WL 4014071, at *19-20.

### 2.  The Trial Court Did Not Err by Failing to Instruct on Accomplice Testimony

The state court determined the accomplice testimony instruction was not warranted under California law.  This Court is bound by the state court's ruling on a question of state law.  *Estelle*, 502 U.S. at 71-72.

The United States Constitution does not require that accomplice testimony be corroborated.  *United States v. Augenblick*, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions."); *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) (California Penal Code § 1111[7] "is a state law requirement that a conviction be based on more than uncorroborated accomplice testimony. . . .  As a state statutory rule, and to the extent that the uncorroborated

---

[7] Under California law, a "conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense."  Cal. Penal Code §1111.

testimony is not 'incredible or insubstantial on its face,' the rule is not required by the Constitution or federal law.") (internal citations omitted).

In contrast to California law, under federal law, "[t]he uncorroborated testimony of an accomplice is sufficient to sustain a conviction unless it is incredible or insubstantial on its face." *United States v. Necochea*, 986 F.2d 1273, 1282 (9th Cir. 1993) (citing *United States v. Lai*, 944 F.2d 1434, 1440 (9th Cir. 1991)). In the absence of Supreme Court precedent, Petitioner is not entitled to habeas relief, because the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law.

Even considering Petitioner's claim that the trial court erred by failing to give the accomplice testimony instruction, Petitioner has not shown that the alleged error had a "substantial and injurious effect or influence on determining the jury's verdict." *Brecht*, 507 U.S. at 623. Petitioner contends Uribe's testimony that Petitioner admitted to participating in the shooting was uncorroborated and was a critical component of the prosecution's case. (Doc. 1 at 45.) However, there was eyewitness testimony that placed Petitioner at the scene and as a shooter. Consequently, as the California Court of Appeal found, the testimony was corroborated by non-accomplice evidence. Therefore, any error in failing to instruct the jury with CALCRIM No. 334 was harmless. For the foregoing reasons, the Court recommends denying Petitioner's claim.

## C. Instructions on Other-Crimes Evidence

Petitioner next contends the trial court violated his constitutional rights by providing the jury with an incomplete instruction on other crimes evidence. (Doc. 1 at 46-50.)

The trial court instructed the jury with CALCRIM No. 375, as follows:

The People presented evidence that the defendant committed the offense of Attempted Murder and Drive By Shooting that was not charged in this case.

You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the offense. Proof by preponderance of the evidence is a different burden of proof than proof beyond a

reasonable doubt. A fact is proved by preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

If the People have not met this burden, you must disregard this evidence entirely.

If you decide that the defendant committed the offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:

The defendant acted with the intent to kill in this case; or

The defendant had a motive to commit the offenses alleged in this case.

In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offenses.

Do not consider this evidence for any other purpose.

If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Murder of that the personal use of a firearm cause great bodily injury or any other charges in this case [have]been proved. The People must still prove every charge and allegation beyond a reasonable doubt.

(Lodged Doc. 11 at 1171-73.)

Petitioner states the trial court had a duty to provide a bracketed portion of the instruction, which states, "Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime." (Doc. 1 at 48.) Further, Petitioner alleges the trial court erred by failing to limit consideration of other crimes evidence to the murder charges only. *Id*. at 49.

### 1. **State Court of Appeal Opinion**

The California Court of Appeal rejected Petitioner's claim that the trial court incorrectly instructed the jury as to other-crimes evidence:

[Petitioner] argues the trial court erred in its jury instructions on other-crimes evidence because the jury was not instructed it could not conclude from the other-crimes evidence that defendant had a bad character or was disposed to commit crime. [Petitioner] further argues the court erred in instructing the jury the other-crimes evidence was relevant to all the charged offenses rather than limiting this evidence to the double murder allegations. The trial court did not err for either reason.

43

. . .

## B. Omission of Bracketed Portion

[Petitioner] now complains the trial court did not include the following bracketed sentence "[Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.]" (CALCRIM No. 375.) [Petitioner] acknowledges the bench notes following the instruction include the following: "Give the bracketed sentence beginning with '"Do not conclude this evidence that"' on request if the evidence is admitted only under Evidence Code section 1101(b).'" (Bench Note to CALCRIM No. 375 (Feb. 2016 ed.) p. 147.) [Petitioner] concedes there was no request for this instruction by defense counsel, but argues the court must still instruct the jury on general principles of law that are closely and openly connected with the facts before the court and the jury's understanding of the case.

The trial court only has a sua sponte duty to give this instruction in the extraordinary case in which unprotested evidence of past offenses is the dominant part of the prosecution's case and the uncharged crimes evidence is highly prejudicial and minimally relevant to any legitimate purpose. (*People v. Collie* (1981) 30 Cal.3d 43, 63-64.) Evidence of the uncharged crime was not the dominant part of the prosecution's case, nor was the uncharged crime different in degree or kind from the charged offenses. In the context of this case, the uncharged crime was not unduly inflammatory or prejudicial. The trial court nevertheless instructed the jury with the most pertinent portions of CALCRIM No. 375.

The bracketed portion of the instruction not given is, in the context of the instant action, similar to a pinpoint instruction. Even if proper, pinpoint instructions are not required to be given sua sponte. (*People v. Hughes* (2002) 27 Cal.4th 287, 361.) The instruction, especially without a request from defense counsel.

## C. Referring to All Offenses in Instruction

[Petitioner] further argues the trial court erred in modifying CALCRIM No. 375 by adding that the uncharged crime evidence could be used by the jury to evaluate [Petitioner]'s intent or motive for all of the charged offenses, rather than confining it to the double murder prosecution. We disagree.

For the purposes of introducing evidence of uncharged acts under Evidence Code section 1101, subdivision (b), the least degree of similarity between the charged and uncharged crimes is required to establish intent. The uncharged crime or crimes need only be sufficiently similar to the charged offenses to support the inference the defendant probably harbored the same intent in each instance. (*People v. Kipp* (1998) 18 Cal.4th 349, 371, citing *People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.) The probative value of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes so long as the offenses have a direct, logical nexus. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15 [motives for shooting and robbing victim tended to show defendant had the same motives earlier that evening when he stabbed a different victim, thus showing an intent to rob rather than an act of self-defense].)

Although the least degree of similarity is required for establishing intent, the uncharged attempted murder of Efrain Sarabia, a former gang member who dropped out of the gang, bore remarkable similarity to the double murder and the attempted murder/carjacking cases. There was also a direct, logical nexus between

the uncharged and charged offenses probative of [Petitioner]'s motive, which was clearly to avenge Northerners by punishing dropout gang members and perceived members of the rival Southerner gang. The trial court's instructions properly focused the jury's attention on what the other-crimes evidence was relevant to show – [Petitioner]'s intent and motive in committing the charged offenses. Promoting and fighting for the Northerner gang was part of [Petitioner]'s intent in committing all the charged offenses and was not confined to the double murder case. We therefore reject [Petitioner]'s argument the trial court erred in having the jury consider [Petitioner]'s intent and motive with other-crimes evidence to all of the charged offenses rather than limiting it to the double murder case.

*Perez*, 2016 WL 4014071, at *20-22.

## 2. **The Trial Court Did Not Err in Instructing the Jury on Other-Crimes Evidence**

Petitioner alleges he was prejudiced by the trial "court's failure to instruct the jury specifically that the other crimes evidence could not be used as evidence of bad character or propensity to commit the charged crimes prejudiced." (Doc. 1 at 50.)

To the extent Petitioner contends that the trial court erred under state law, his claim is not cognizable on federal habeas review. *Estelle*, 502 U.S. at 71-72 (allegation that jury instruction was incorrect under state law "not a basis for habeas relief").

Petitioner's claim also fails under federal habeas review, because Petitioner has not identified any Supreme Court precedent which clearly establishes that permitting a jury to consider evidence of a defendant's uncharged criminal conduct violates the Due Process Clause. Indeed, the United States Supreme Court has not resolved whether the admission of prior bad acts under state law to show propensity constitutes a due process violation. *See Estelle*, 502 U.S. at 75 n. 5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."); *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) ("The Supreme Court has expressly reserved the question of whether using evidence of the defendant's past crimes to show that he has a propensity for criminal activity could ever violate due process."). Where the Supreme Court has not "squarely established" a legal rule that governs a particular claim,

it cannot be said that a state court's decision unreasonably applied federal law when it adjudicated the claim. *See Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).

Finally, the claim would fail on the merits, even if it was cognizable. Where a state court has rejected a due process claim on the merits, federal habeas relief is only appropriate if the state court's application of the governing Supreme Court precedent was objectively unreasonable. *White v. Woodall*, 572 U.S. 415, 419 (2014). Here, the state court reasonably concluded that the bracketed language in CALCRIM No. 375 was not necessary, because "[e]vidence of the uncharged crime was not the dominant part of the prosecution's case." *Perez*, 2016 WL 4014071, at *21. Further, the Court of Appeal reasonably found "[t]here was [ ] a direct, logical nexus between the uncharged and charged offenses probative of [Petitioner]'s motive, which was clearly to avenge Northerners by punishing dropout gang members and perceived members of the rival Southerner gang." *Id.* at *22.

The Court of Appeal's factual determinations are reasonably supported by the record, and thus presumed correct. *See* 28 U.S.C. § 2254(e)(1); *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). There were permissible inferences the jury could draw from the uncharged crimes evidence, and Petitioner does not plausibly argue that the trial court's CALCRIM No. 375 instruction contained an incorrect statement under California state law. Therefore, it was reasonable for the Court of Appeal to conclude that the trial court did not err in giving the jury instruction. Nothing in the record suggests that permitting the jury to consider the other-crimes evidence rendered the trial fundamentally unfair or violated due process.

For the foregoing reasons, the undersigned recommends denying Petitioner's jury instruction error claim.

46

## VII.  Cumulative Error

In his fifth ground for habeas relief, Petitioner alleges the combined effects of all the errors rendered the trial fundamentally unfair.  (Doc. 1 at 51.)

### A.  State Court of Appeal Opinion

The California Court of Appeal rejected Petitioner's cumulative error claim:

> [Petitioner] asserts the combination of all the issues he has raised constitutes cumulative error.  The cumulative effect of errors must be sufficiently prejudicial to warrant reversal of guilty verdicts.  Where there are few errors and each one is harmless when separately considered, there is no cumulative error warranting reversal of guilty verdicts.  (*People v. Jurado* (2006) 38 Cal.4th 72, 127; see *People v. Jenkins* (2000) 22 Cal.4th 900, 1056.)  Here there were no errors shown on appeal, therefore there is no cumulative error.

*Perez*, 2016 WL 4014071, at *22.

### B.  Cumulative Error

Under the cumulative error doctrine, the combined effect of multiple errors at trial can give rise to a due process violation, if the errors rendered the trial fundamentally unfair, even if each error considered individually would not warrant relief.  *See Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007).  "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense far less persuasive" and thus "had a substantial and injurious effect or influence on the jury's verdict." *Id.* (internal citation and quotation marks omitted).  The Ninth Circuit has "granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (citing *Parle*, 505 F.3d at 927).

The Court has addressed each of the errors raised by Petitioner in his petition for writ of habeas corpus and found no error.  Therefore, "[b]ecause we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible." *Hayes v. Ayers*, 632 F.3d 500, 524 (9th

Cir. 2011).  Accordingly, the undersigned recommends denying Petitioner's claim of cumulative error.

**VIII.**  **Certificate of Appealability**

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

> (b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

> (c)      (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

> (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

> (B)  the final order in a proceeding under section 2255.

> (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

> (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Although the

petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Accordingly, the Court recommends declining to issue a certificate of appealability.

## IX.    **Recommendation and Conclusion**

Based on the foregoing, the undersigned recommends that the Court dismiss the petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C  636(b)(1).  Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court.  The document should be captioned Objections to Magistrate Judge's Findings and Recommendations.  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:    __January 15, 2019__                    _____/s/ *Sheila K. Oberto*_____
                                                                UNITED STATES MAGISTRATE JUDGE